IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          17-CR-6089 DGL

JASON GUCK,

Defendant.

## DEFENDANT'S STATEMENT WITH RESPECT TO SENTENCING FACTORS

IN ACCORDANCE WITH LOCAL PROCEDURAL GUIDELINES TO GOVERN SENTENCING PROCEDURES UNDER THE SENTENCING PROCEDURE ACT OF 1984 IN THE WESTERN DISTRICT OF NEW YORK; RULE 12 OF THE FEDERAL RULES OF CRIMINAL PROCEDURES; 18 U.S.C. 3553; §681.2 OF THE UNITED STATES SENTENCING GUIDELINES ("USSG) AND *U.S. V. BOOKER*, 125 S. CT. 738 (2005); *U.S. V. CROSBY*, 2005 WL 240917 (2D CIR. N.Y.).

The Defendant, Jason Guck, by and through his attorney, Joseph S.

Damelio, Esq., has thoroughly reviewed the Revised Pre-Sentence Investigation

Report (PSR) dated October 9, 2018, as prepared by Jennifer L. Fish, U.S.

Probation Officer, and adopts the findings with regard to the aggregate guideline

imprisonment range and Defendant's Criminal History Category.

## PLEA OF GUILTY

On July 23, 2018, the Defendant, Jason Guck, waived Indictment and pled

guilty to a 2-count Superseding Information in which Count 1 charged Conspiracy

to Commit Wire Fraud in violation of 18 USC 1349.  Count 2 charged Filing a

False Tax Return in violation of 26 USC 7206(1).  The Rule 11(c)(1)(B) Plea

Agreement calls for an advisory guideline range of 51 to 63 months

imprisonment.


### STATEMENT OF JASON GUCK

On July 23, 2018, I entered pleas of guilty to Conspiracy to Commit Wire

Fraud and filing a false tax return.

I accept full responsibility for my actions and blame no one but myself.

I wish to apologize to the investors who had enough faith in our business

to lend us a significant amount of money, only to be deprived of their full share of

the return on their investment.  My actions, and failures to act, were wrong and a

gross deviation from the person that I am.

I also want to apologize to the 5LINX family, especially the representatives

and the people in the trenches.  They expected more and deserved more from

me in this regard.

I wish to apologize to my family who have endured this prosecution

alongside me and supported me through thick and thin.

I have made terrible mistakes with intentional purpose and I sincerely

regret my actions.

/s/ Jason Guck_____
Jason Guck

## 18 U.S.C. 3553 (a) FACTORS

18 U.S.C. 3553(a) states that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of subsection (a) which are stated as follows:

- To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- To afford adequate deterrence to criminal conduct;

- To protect the public from further crimes of the defendant; and

- To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

## MULTI-LEVEL MARKETING COMPANY

Multi-Level Marketing (MLM), is really a marketing strategy for the sale of goods and/or services where the revenue of the MLM Company comes from a workforce selling the companies goods and services, while the earnings of the participants/representatives are derived from a top-to-bottom compensation commission system.

Last year 18.2 million people were involved in MLM in the United States and recorded $34.5 billion in sales.

Each MLM company dictates its own specific compensation plan for the payout of any earnings to their respective participants/representatives.  The common feature found across all MLMs is that the compensation plans pay out to participants from a limited number of potential revenue streams.  First,

compensation can be paid out from commissions of sales made by the participants/representatives directly to their own retail customers.  Second, compensation can be paid out from commissions based on the sales made by other distributors below the participant who had recruited those other participants into the MLM.  In the organizational hierarchy of MLMs, these participants are referred to as ones *down line* distributors.[1]

MLM salespeople/representatives are expected to sell products directly to retail customers by means of relationship referrals and word of mouth marketing. They are also incentivized to recruit others to join the company as fellow salespeople/representatives so that these can become their down line distributors.[2]

Although many feel that MLMs are the same entities as classic pyramid schemes, there are significant distinctions between the two.  First, MLMs are legal viable businesses.  Second, MLMs always encompass the sale of actual products/services, while traditional illegal pyramid schemes ordinarily do not. And third, climbing an MLM is possible, whereas climbing a traditional illegal pyramid scheme is theoretically impossible.

In a September 27, 2012 article in Forbes Magazine, it stated that not only are "home businesses" or "MLMs" very interesting, they are successful.  "Many of the longest standing organizations in this country have this business model. See, Jody Greene, "Is MLM a Bad Word?". Forbes Magizine, September 27,

---

[1] DuBoff, Leonard D. (2004). *The Law (in Plain English) for Small Business*, Sphinx Pub. pp. 285-286.
[2] Xardel, Dominique (1993). *The Direct Selling Revolution. Understanding the Growth of the Amway Corporation.* Blackwell Publishing. pp. 1-4

2012.  Some of the more popular MLMs include Mary Kay, Avon, Advocare and Tupperware.  We all know people who sell these types of products because they believe in the products and the companies that stand behind them.  Much is the same regarding 5Linx.  Their people believe in the products/goods and stand behind them.

5Linx is and was an MLM headquartered in Rochester, New York.  They offered real products such as utility and telecommunication services, health insurance, nutritional supplements, and business services.  The company was founded in 2001 by Craig Jerabeck, Jeb Tyler, and Jason Guck.

5Linx was on the Inc. 500 list of fastest growing companies from 2006 to 2009, and in 2009 5Linx was ranked on the Rochester Top 100 list as the second fastest growing company in the region.[3]

In May 2015, the company sold its telecommunications branch to Birch Communications, reducing the company's revenue by approximately 30%.

## 5LINX HIERARCHY

The company was founded in the year 2000 in Rochester, New York.  Its products included essentials and services for home and business.

The Founders of the company were Craig Jerabeck, Jeb Tyler, and Jason Guck.

Craig Jerabeck was the President and Chief Executive Officer.

Jeb Tyler was the Executive Vice President of Marketing.  Jason Guck was the Executive Vice President of Sales.

---

[3] "RBA Celebrates the 2009 Rochester Top 100".  Rochester Business Alliance, 9-24-12

Mr. Guck is a high school graduate of the Edison Technical High School in Rochester, New York.  He was educated within the Rochester City School District.  After a number of post-high school jobs, Mr. Guck gravitated to direct sales and MLM companies.  His primary role with 5LINX was to drive revenue, recruit the sales force and travel extensively throughout the US and foreign countries to help build the 5LINX family.  Mr. Guck was traveling approximately three weeks out of every month as Executive Vice President of Sales.  He would always prepare new representatives to succeed and he was invested in the representatives.  He was often called the "Representative's Founder" of 5LINX, as it was his face seen most often by the representatives and sales force.  Quite frankly, it was Mr. Guck with whom the representatives found themselves attached to because of his interest and care in their success and personal lives. (see Defendant's Letters in Support, "Business Associates").

### THE INVESTORS

On June 23, 2006 5LINX entered into a venture capital Stock Purchase Agreement with Trillium Lakefront Partners and Shalam Investment Company, LLP.  They initially invested $3.5 million and received a minority ownership stake in 5LINX.

On July 6, 2007, 5LINX and the Investors entered into a second venture capital Stock Purchase Agreement.  The Investors invested $2.0 million for additional stock and a slightly larger ownership stake in 5LINX.

The Investors' ownership stake never exceeded 23%, even after both investment rounds.  The three Founders at all times owned at least 70% of the company.

The Investors and Defendants were both represented by counsel during the first and second Stock Purchase Agreements, and at the time of the first Stock Purchase Agreement in 2006, all Founders were required to enter into Employment Agreements with 5LINX.  Said Employment Agreements were drafted by counsel for the Investors.

The Employment Agreement expired in 2011.  It indicated that the Employee would receive other substantial economic benefits from 5LINX that he was not currently entitled to.  Any increase in employee compensation or bonuses required Investor permission.

The Employment Agreement was silent as to whether the Founders could act as independent representatives of 5LINX.

Mr. Guck was of the belief at the time, based upon discussions with others, that he was allowed to work and receive money as an independent representative without seeking permission of the Investors.  **In response to the Government's anticipated response, and the email of Bradford Harries to FBI Special Agent Kristin M. Gibson of October 31, 2018, in retrospect Mr. Guck believes it was improper and illegal to work and receive money as an independent representative without seeking permission of the Investors. He accepts full responsibility for this and blames no one but himself for his actions**.

The Founders formed companies to receive the independent representative compensation, as is commonplace with MLM Companies.

Mr. Guck has admitted to filing a false tax return with regard to his aforementioned corporations.

## THE FOLDING OF 5LINX

Although 5LINX is still active today, it is a shell of its former self because of two reasons, namely the death of telephone landlines and the polar vortex.

When 5LINX was first formed, the company chose to provide landline phone service in a variety of forms.  By 2014, the year of the Investor buyout, less than 50% of homes retained a landline telephone.

A polar vortex is a weather phenomenon that basically results in long periods of cold weather and below-average temperatures.  In 2014, a polar vortex event resulted in over $5 billion in damages and losses.  This event had a devastating financial impact on 5LINX, because the company had just recently entered the deregulated energy market and made a large commitment.  When temperatures dropped dramatically and energy costs rose, 5LINX was not properly hedged and did not have a credit sleeve.  The company was getting cash calls and purchasing power at up to 20 times the regular cost.

The company encountered financial struggles, but not before it had been locked into the Investors' $22 million buyout.  5LINX tried to recover and integrate new products like coffee, headphones, nutritional supplements, etc. but

could not catch up to replacing the monthly recurring revenue of telecom and energy customers.

## SALE OF INVESTORS' SHARES BACK TO 5LINX

As early as the initial purchase by the Investors, agreements were executed that calculated what the amount of the return on investment would be if 5LINX achieved certain levels of success.

They would have realized approximately $22 million if 5LINX performed to its maximum capability or was sold or an IPO occurred.

In 2013 the Founders offered to buy back the Investors' shares for $16,500,000.00, which was declined.

In 2014 5LINX reluctantly agreed to purchase the Investors' shares back for $22,000,000.00.  The Founders did not believe that, pursuant to the return on investment calculations in the agreement signed at the time the Investors purchased their shares, the Investors were entitled to $22,000,000.00, but the Investors refused to accept a lower number.  The Founders found that in order to gain control of 5LINX, so they can try and lead it back to being a thriving company, they had to accept the offer.

At the sale, the Investors received approximately $11,200,000.00 from 5LINX/Founders, excluding the prior $1 million dividend and the $1 million paid pursuant to promissory notes at the time of the sale, which means that the

Investors received $13,200,000.00 cash on their initial investment of $5.5 million. This was one of the best returns on investment that Trillium has seen.

In addition to the cash payout to the Investors, they received promissory notes totaling $10,000,000.00. This included required monthly payments of approximately $250,000.00. After the sale, 5LINX/Founders made approximately $1,000,000.00 in payments on the promissory notes signed at the sale.

Ultimately 5LINX could not keep up with the $250,000.00 monthly payments required by the Investors and they negotiated a reduction in the promissory notes in the amount of $4 million.

Mr. Guck has admitted that the monies received by the Founders pursuant to a vendor deal with a company called Ocenture was not proper. This amount received by the Founders was $2.31 million, or $770,000.00 per Founder.

The Ocenture money was not received by the Founders as independent representatives or employees. They were receiving the payments as "brokers" of the Ocenture deal. As there was an Employment Agreement, receiving payment as a broker on the Ocenture deal violated the non-compete cause.


### NON-GUIDELINES SENTENCE

The Plea Agreement allows the Defendant to recommend a sentence outside the Sentencing Guidelines Range.

### A.    Defendant's Role in 5LINX

Jason was involved in the sales operations of 5LINX. He was not the one making policy or negotiating with the Investors. He was also not the person who

was tasked with negotiating the Employment Contract.  This is not an excuse, but merely an explanation of Jason's role with the company.  He would much rather be travelling from city to city, meeting people, training representatives, and watching them grow within the company.  The Founders all had their own areas of expertise.  Jason's expertise was not in the area of contract negotiations or finance, but rather sales and training.

### B.    Forfeitures

Pursuant to the Plea Agreement, Jason agreed to forfeit all funds on deposit in his Charles Schwab account, all funds seized from two Canandaigua National Bank accounts, all funds seized from Jason's E-trade Securities account, and any and all right, title, and interest in the Canandaigua Lake home owned by Jeb Tyler and himself.

### C.    No Criminal Record

Mr. Guck is a Criminal History Category I, with no criminal record.  In 1994, at the age of 18 he was adjudicated a Youthful Offender in Rochester City Court, replacing and vacating a misdemeanor charge of Criminal Possession Controlled Substance Seventh Degree.

There is no other criminal conduct alleged, nor are there any pending charges.

### D.    Defendant's History

Mr. Guck is 43 years of age.  He is married with three children and resides in the Town of Victor, New York.

Jason has always expressed his remorse for his involvement in the charges which led him to plead guilty, and has accepted full responsibility for his actions.

When this writer spoke with Jason after he entered his plea of guilty, I told him that it would be a good idea if we could get a few letters from family, friends and business associates where they could describe the type of person Jason really is.  To my shock, my office received close to 200 letters in support of Jason.  Because of the numerous letters received, we needed to pare the submitted letters down to approximately 55.  This amount of support was not due to a campaign on the part of Mr. Guck to solicit letters on his behalf, but rather the outpour of support, unsolicited, from family, friends and business associates.  These letters were previously provided to the court in a document entitled "Defendant's Letters In Support".  The following represents just a few of the things that people have said about Mr. Guck in his support:

- "I have never met a person more dedicated to his family or a cause he believes in than Jason.  Once he starts anything, he goes at it 100% and won't stop until he has accomplished his goal. . . .For not going to college, he found something to shoot for and took to the top. . . . **George Maddalina**

- "I first met Jason 3 years ago when I was organizing a charity fundraiser to celebrate the life of a local 12 year old hockey player who was fighting cancer at the Golisano Children's Hospital. . . with Jason's drive and tireless dedication the ensuing months turned into a daily regimen of what

we could do to make this the greatest charity event of the summer. . . clearly Jason put much of his life on hold to help me and most importantly to benefit our young friend and the patients at the Golisano Children's Hospital . . . one of my most vivid memories was watching Jason be the first to volunteer to have his head shaved to raise money for the cause. Dozens of others would soon follow Jason's lead." . . . **Daniel Prince**

- "One instance of his good deeds that I witnessed that struck me the most was a day after we had lunch at a restaurant on East Avenue.  It was freezing out, and the snow had not stopped since morning.  As we walked out, there was a homeless man who seemed like he was freezing to death.  Upon Jason seeing the man, he went to his car, picked up a jacket from his back seat, and went to the restaurant we were having lunch at and ordered the homeless man the same meal he was having at the lunch table and gave it to him.  I will never forget the facial expression and the appreciation the homeless man gave Jason." . . . **Bassem Yammout**

- **Jennie Brooks Klingenbeck**, a retired teacher, and single mother from Birmingham, Alabama, wrote, "Jason has been a life-saver in the personal lives of my son and myself.  He took it upon himself to be role model, led by example, and talked endless hours to my son.  Jason did this all on his own.  He gave my son encouragement, sound advice and helped him get on the right path.  Without Jason's personal time and influence, I do not know what direction our lives would be going in at this point."

- "I met Jason at the corporate office, during my first visit to Rochester. During that time, I received a call from my family informing me that my Aunt was tragically killed [in an automobile accident] . . . Jason, only knowing me for a few hours comforted me and began to make phone calls to the airlines to find me a flight home.  I will never forget the concern and care he showed me." . . . **Rose Battle**

- "I used to have a drinking problem, and Jason was the one friend that actually realized it was a problem, sat down with me, made me get help, and is the reason I have been sober for almost two years now.  Without him, my life could have been wasted and he recognized the talent, made sure I stayed away from the wrong people, and he always told me the most important habits to build." . . . **John Brooks Klingenbeck**

- "To be perfectly honest, Jason and I are quite different.  We have not always seen eye to eye.  But there is a goodness to Jason that cannot be denied. . . First, when an 11 year old boy within our hockey family was not doing so well in his fight against cancer, a group of us moms set out to coordinate a very small day in his honor to let him know that others were thinking about him.  When Jason caught wind of this, he wanted to do more to help and quite literally orchestrated an army to turn this from a small day of honor to an actual event.  He looped in two NHL hockey players to be a part of the day.  The young boy would then spend the morning in a limo with some friends, visiting with two NHL hockey players and partaking in fun activities with them.  While this was not at all what us

moms had in mind, what Jason did ended up being one of the last amazing memories this young boy was able to have.  It also led others to want to do more. . . . "  **Heather L. Kraft**

- "He was a lose cannon who rather worked long and hard hours but paid no attention to details, personalities, partners and applicable law.  He has admitted these shortcomings to me and asked if I could help him in understanding what to do and how to do it within the framework of current legal procedure. . . . I sincerely believe that he has 'turned the corner' in relation to civil and business matters.  He is a hard working man and was successful in the past.  I believe he deserves a chance to continue his good work . . . "  **Michael A. Rose, Esq.**

- "Jason is the man you can call on any time when you are in need, as he'd give the shirt off his back.  The man is extremely loyal to others and is a devoted father and husband. . . In his role as Executive VP of Sales, he motivated the field to increase their production and to do that he had to spend time with them, sacrificing his time away from family. . . "  **Denise Nowak, Vice President 5LINX**

- "Jason Guck appears to be the type of person of good moral character and integrity.  He is loyal and a hard working individual who has helped many of his friends and colleagues achieve success.  Jason always showed great enthusiasm for others to succeed and reach their true potential. . . . "  **John Coriddi**

- "In a word Jason operates with an unselfish attitude and puts others before himself . . . " **Jeremy Barnett**

- "Mr. Guck has taught me a lot in regards to personal development and how to never give up.  I took what I learned from him and applied it to my job as a probation officer working with both juveniles and adults.  This gift from Mr. Guck has made me a better person so much that I was promoted twice as a result of my work ethic and passion to help others.  Not only was I promoted but the clients I worked with became successful because of the lessons I taught them . . . that were taught to me by Mr. Guck. . . . Mr. Guck not only touched my life but the lives of thousands he has come across." **A. Joy Brown**

### E. Charitable Contributions

Mr. Guck has also volunteered and contributed to several charities.  He has always had time to work on and for such as ALS, Strong Children's Hospital, Ronald McDonald House, Habitat for Humanity, Young Women's College Prep, Make A Wish, Center for Missing and Exploited Children, Golisano Center, Beach Hockey and Puck Cancer Tournament, and many more.  He has never asked for any recognition or attribution.  He merely feels that charitable service is something we should all do.  And this comes from a man from very humble beginnings.

### 18 U.S.C. 3553(a)(4)

Title 18 U.S.C. 3553(a)(4) mandates the court to consider "the kinds of sentences available."  This statute would allow for probation and community

service to satisfy the goals of sentencing.  In fact, there has been a long-time endorsement of community service by both federal and state courts because the individual judges recognize that it " . . . is a burdensome penalty that meets with widespread public approval, is inexpensive to administer . . . produces public value . . . and can to a significant extent be scaled to the seriousness of crimes." See *Intermediate Sanctions in Sentencing Guidelines,* National Institute of Justice, May 1997.

The imposition of a community service as a sanction would allow the community to be served by Mr. Guck and benefit with his time and expertise. Community service would work because Mr. Guck's professional skills would be paired with community organizations that benefit from these skills but are not in a financial position to secure his services, although he has been a charitable volunteer/contributor his entire adult life.

Community service as an alternative sentence can sufficiently recognize the grave seriousness of Mr. Guck's crimes and involve a punitive restriction, but moreover it can utilize his time, skills and expertise to benefit the community in need.  Alternatives to incarceration exist that can carry both the community and the court's condemnation of his conduct, but channel it in a way that is more constructive and beneficial.

## **CONCLUSION**

A sentence of probation will allow Mr. Guck to continue to work and pay restitution in a timely manner.  He is a proven earner and intends on paying restitution in full.

In light of his lack of criminal record, his contributions to the community, his ability to continue to pay restitution, and the non violent nature of his crimes, we respectfully request that the Court sentence Mr. Guck to a term of probation.

Dated:        Rochester, New York, December 1, 2018

BY:  s/JOSEPH S. DAMELIO, ESQ.
         Attorney for Defendant
         125 State Street, Suite 100A
         Rochester, New York 14614
         (585) 442-7360

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,


                v.                                      17-CR-6089 DGL

JASON GUCK,

                Defendant.

## CERTIFICATE OF SERVICE

        The undersigned hereby certifies that on December 4, 2018, I

electronically filed the foregoing with the Clerk of the Court using the ECF system

and a true copy of the foregoing Defendant's Statement with Respect to

Sentencing Factors regarding the above captioned case and it was served either

electronically or by U.S. First Class Mail upon the following:


Richard A. Resnick, Esq.
Assistant United States Attorney
Western District of New York
100 State Street
Room 500
Rochester, New York 14614

Jennifer L. Fish
U.S. Probation Officer
Federal Building
Room 111
Rochester, New York 14614

                        BY:    s/JOSEPH S. DAMELIO, ESQ.
                               Attorney for Defendant,
                               Jason Guck